Good morning, Your Honors. My name is Robert Gombiner from the Federal Defender's Office, and I represent Mr. Stenson along with Cheryl McLeod, who is here at the Council table. Daryl Stenson was denied the right to self-representation, which is guaranteed to him by the Sixth Amendment and Freda v. California. He made an unequivocal request to represent himself. Let me ask you something about that. From the time we're children, we all make statements in the form, if you don't do X, I will do Y. We make them throughout our lives. Often people call our bluffs and don't do X, and we often don't do Y. The conditional statement in form is an unequivocal statement. And I take them literally, if you don't do X, I will do Y, means unequivocally I will do Y if you don't do X. But it doesn't work out that way in the common usage of speech. Plus, Stenson told the judge, I don't really want to do Y. So why should, I guess I have two questions. Why should we regard his, if you don't do X, I want to do Y statement as unequivocal? And second, is there Supreme Court authority that tells us that that form of statement falls within the Feretta unequivocal category? Well, Your Honor, the answer to the first question is that under Feretta itself and this Court's precedent, a conditional or alternative request does not render the request unequivocal. In fact, in Mr. Feretta's case, Mr. Feretta Does not render unequivocal or equivalent? Does not render, I'm sorry, unequivocal. Equivalent. Go ahead. There's a lot of uns and Xs in there. In any event, in Mr. Feretta's case itself, Mr. Feretta three times asked for different counsel than the public defender's office. The Supreme Court did not say that that meant that his request to represent himself was I'm looking at it now. Tell me the words I should be looking at in Feretta. It's a footnote, Your Honor. I think it's The long footnote with the text of the colloquy, footnote two? No, I think it's footnote six, Your Honor, but I may be wrong about that. There's a statement in there that he three times It's not footnote six, I don't think. It may not be footnote six. I'm just modifying the citation. But there's a footnote in there that says that he three times asked for different counsel than the public defender's office, the California public defender's office. Did your fellow, I know he expressed a preference. Your Honor, I want you to appoint different counsel. I have different counsel lined up, and if you don't, I'd rather represent myself, though I really don't want to do that. Did he ever, after the judge said, nope, I'm not going to give you a new attorney, we've been in voir dire for three weeks, it's not going to happen, did he then say, Your Honor, I request the right to represent myself? Your Honor, under this court's precedent, the fact that after he had been denied Wait, you understand I'm not asking you about this court's precedent, because under AEDPA, I don't care about this court's precedent. I'm asking you about the facts of the case. And I understand that, Your Honor. But here's what happened. Mr. Stenson filed a written motion to either have new counsel or an attorney to represent himself. The judge, the trial judge, without hearing any evidence, without hearing any statements from Mr. Stenson or anyone else as to why Mr. Stenson is making this request, denied the request in a peremptory but completely final manner. Counsel, I don't think that's correct. There was a long, I've read pages and pages and pages of conversation in chambers between the judge and Stenson and Leatherman as to why Stenson was not happy with Leatherman and why Leatherman thought Stenson's tactics and strategy were wrong. And, Your Honor, you're totally correct. What I meant to say was, I think I did say, was that he denied Mr. Stenson's request to proceed pro se immediately upon getting that written motion, and he denied it in finality. If you'd like me to read the... It's real helpful to have page numbers because we like to make our own judgments. That's right, Your Honor. And if you take a look at page one, page 147. He says, this is ER 147. The judge says, So I find this not really requested and I will not nor will I consider a motion to allow Mr. Stenson at this time to act pro se on his behalf. So the only issue is whether or not there will be allowance of current counsel to withdraw with appointment of new counsel. Now, then, in this final ruling, I think, is one can make. And then, let me refer the court to Executive Record 153. The judge says, additionally, as I indicated, Mr. Stenson made it clear that he wants to be represented by counsel, not by himself. His statements make that clear. So I think that's not an issue, his pro se representation. I essentially ruled that out of my considerations in this case. Wait a minute. What you just read to us, I think Mr. Stenson makes it clear he wants to be represented by counsel, not himself? Did I get the words right? That's what the judge said. That means to the judge, one time the judge says one thing, one time the other. It sounds like he doesn't understand what Stenson wants. Well, I don't think that's true, Your Honor, because at the point that the judge makes that statement, Mr. Stenson has not made any statements at all about his desire for pro se representation. It's clear from the record that Mr. Stenson makes this motion and the judge denies the pro se motion based solely on the written request. And he does this because, one, he says that if you're asking for counsel and the alternative, that that means you are not actually, you don't actually want to represent yourself. And two, he says that because of where we are in the trial, it's untimely. Counsel, I have some problems with where we go with this on Coretta. This is a death, potential death case. The defendant is asking for new counsel and saying, if I don't get it, I will represent myself. He doesn't get it. I guess that can be interpreted as a request to represent himself. But are there any cases since Coretta that has held that a death defendant, have overturned a death penalty case on the grounds that the defendant should have been allowed to represent himself? I have some real problems with saying that this trial court under established Supreme Court law should have permitted this death potential defendant to represent himself. Well, Your Honor, I think the answer to that again can be found in Coretta itself because Coretta makes clear that the right to self-representation is tied up... I didn't ask about Coretta. I've read Coretta. But I'm just asking you about the state of the law as to whether or not you have any cases in which a death defendant was held on habeas to have been entitled to proceed pro se. Well... I'm just... There are cases in which people... the death penalty have been... have proceeded... Yes, there are. ...by counsel. So, obviously, requests have been granted. I'm not aware of any cases where a court thinks that it was... No, I'm looking for habeas cases so that I can understand what we should do here. I'm not aware right now of a specific... I know in the Kaczynski case, which there wasn't... Now, there, the request was ultimately denied, and there was a dissent, but the court did find that the request was properly denied. But the Kaczynski case certainly didn't say that there was any bar to a defendant in a death penalty case asking to represent... I'm not questioning that a defendant can ask. And I'm not questioning that a court can grant that right under Coretta, and perhaps a trial court should grant that right depending on the circumstances and how it's made and whether it's a true request for pro se representation. I'm just asking on habeas, is there any case that says that it was contrary to clearly established law for a trial court to refuse a Coretta request in a death case? Because I've read a lot of transcripts of death cases where the defendant did go pro se. They're fraught with difficulties as well. That may well be true, but... I'm just asking. I don't have any... I'm not aware of a specific case, but I do think that's why it's important to go back to Fretta, which, after all, is the clearly established federal law on this subject. I just want to read to the court from Fretta. This is Fretta, page 820. The right to defend is given directly to the accused, for it is he who suffers the consequences if the defense fails. And, again, this is Fretta, page 834. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer of the state, will bear the personal consequences. I don't think we have any problem with the general proposition. The problem is whether this defendant made it unequivocally clear that that's what he wanted to do. When I read his remarks, what I understood him to want to do was to get a different lawyer, because his lawyer would not pursue the I wasn't even there defense. It must have been the guy's wife who did it. That was the defense he wanted to pursue, and his lawyer wouldn't do it because he thought it would get him executed. He wanted a different lawyer, and it was as a backup that he said, if you don't give me what I want, then I want to represent myself. And, Your Honor, I agree with that. His first preference was to get a different lawyer. So what I'm looking for is, after it was clear he wasn't going to get a different lawyer, did he unequivocally say, okay, I understand the deal. I'm not getting a different lawyer. It's either this lawyer or nothing. I want nothing. I want to represent myself. Absolutely he did, because right after the trial judge rules that. This is a page reference? Yes, Your Honor. It's page 205. Your extraditive record 205. The court has, after, as Your Honor pointed out, there's been a lengthy policy about whether Mr. Stenson should get new counsel. Now the court has said, first he has denied the request. And then the court says, this is at page 205, therefore the motions which Mr. Stenson has made are going to be denied, and we will proceed to trial at this time. Are there any questions? Now, Mr. Stenson has just been denied the right to have new counsel. And then Mr. Stenson says, yes, Your Honor, there are questions. I would formally make a motion then that I be able to represent myself. I do not want to do this, but the court and the counsel I currently have forced me to do this. Now, that is as clear a request as one can make. This is during when is this? This is on July 14th at the end of the hearing time, whether or not Mr. Stenson should be allowed to have new counsel. I heard the I do not want to do this. He doesn't want to do it. Why don't you address the corollary question, because we don't have unlimited amount of time, which is that he had ineffective assistance of counsel, apart from Miss Loretta. Well, would you like me to address? Whatever you want to address. I think we should move away from Miss Loretta. All right, Your Honor. The next point I want to make is that the key hearings here are the, in many respects, the July 12th to 14th hearings. And those hearings revealed that Mr. Stenson was not able to get the chance to represent himself. He was denied counsel at those hearings because Mr. Leatherman, who was the lawyer for Mr. Stenson, acted as an adverse witness to Mr. Stenson and acted as an antagonist to Mr. Stenson. Not an adverse witness in the sense that he called him a liar the way that Mr. Wolf called Mr. Wadsworth a liar when he said to the judge, what Wadsworth says is a bunch of phooey. He didn't impugn the credibility nor the character of Stenson. What he did was to set out quite clearly to the judge his professional judgment that what Stenson was pursuing was not in the best interests of Stenson, which is the duty of every professional attorney. So when he takes a position contrary to Stenson's position, why does that make it adverse to Stenson? Well, Your Honor, if Mr. Leatherman had simply stopped with, by saying that I have one position and Mr. Stenson has another, that would be one thing. But that's not what happened at these hearings. The judge went on and asked him, why are you taking this position? And the answer from Leatherman was, because our own expert has flipped. He's gone the other way and he said that he agrees with the prosecution expert on the bloodstain evidence. Your Honor, first, that is not what happened because Mr. Leatherman, all those things about the bloodstain expert, that wasn't in response to the court's question. The court, in fact, had told it very clearly at the start of the hearing, because I don't want to hear anything incriminating. And it's Mr. Leatherman who, on his own hook, decides that he is going to tell the court in great detail why Mr. Stenson is guilty, despite Mr. Stenson being adamant that Mr. Stenson is innocent. Now, I don't know how much more antagonistic you can get when you're trying to prove your client guilty when your client is there saying, unrepresentative, look, I'm innocent. And that's what happened at these hearings. You know, in real life, you do it all the time. I mean, you defend, if your client runs a red light and hits somebody, you don't tell the jury he didn't run the red light when they're going to know that he did. You tell them the damages aren't as bad as the plaintiff claims. It's just routine lawyer strategy to concede what's incontestable and contest the rest. Well, first, Your Honor, it was contestable. Mr. Stenson said there were two possibilities in this case. Either Mr. Stenson did it or Mr. Stenson didn't do it. There weren't any mental defenses. There weren't any provocation defenses. It was either he did it or somebody else did it. Mr. Stenson said, I didn't do it. Mr. Letterman spent most of the hearing, number one, telling the judge why Mr. Stenson did it. He does it using privileged information. He's a blood evidence expert. No, it's a defense expert.  I thought the defenses were he did it, but give him mercy instead of vengeance, or he did it and he's also a liar, so he deserves some mercy. I'm sorry, Your Honor. On a criminal case, instead of liability and damages, you have guilt and penalty. And you address both. And one approach to the defense is he didn't do it. Another is he did it, but show him mercy. The alternative is he did it, but you've blown your mercy defense to the penalty by your client presenting a false and alienating defense. Well, Your Honor, first, I must say that I think that when a defendant says, I didn't do it, the defendant has the right to have a lawyer who will be an advocate for that. This is a very difficult ethical problem, I would think. The lawyer, as I understand it, the lawyer here was, are you suggesting that he had a conflict or something with respect to this or that there was some other kind of motivation? Because as I understand it, he was quite honest, and the way that the trial court treated it, he honestly believed that it was better strategy to try to argue the case at the death phase and try to save his client from execution rather than trying to win a case, trying to argue vociferously that his client didn't do it when the evidence all said that he did. Well, I understand. It is difficult, but it's not really difficult if you think of what a lawyer's role is. A lawyer is supposed to be an advocate. Mr. Stenson said... Does he need to be an advocate for a position that he knows no reasonable juror is going to believe is the case? Well, number one... I thought you were a counselor as well as an advocate. I'm sorry? I thought the lawyer was a counselor and not just an advocate. The Supreme Court has said in Strickland v. Washington and Anders, in one case after another, that the fundamental duty of the lawyer is to be an advocate. I represented a lot of clients when I did criminal defense who were really stupid and had very poor ideas, and the most valuable thing I did for them was talk them out of pursuing them. Your Honor, I've represented a lot of clients, too, and I hope I've done that a lot of times, and there's nothing wrong whatsoever with telling a defendant, look, your chances in this case are bad, you should comp or plead. I mean, that's what we do. I work at the Federal Defender's Office. They're stock and trade-applying people. They should plead guilty. But when a client says, I want to go to trial and I want to win the case, I don't go and tell the judge. I'm not going to tell you, Your Honor, if you're presenting me with a case. Look, my client wants to get off, but I think he's guilty, so therefore all I'm going to do is I'm not going to do everything I can to get him off. Wait a minute. What was the issue before the judge when all of this was discussed? Listen to the question the judge asked. But I would like counsel's comment on this. I'm reading from page 4777. I would like counsel's comment on this. If you, Leatherman, continue as counsel, who ultimately is going to decide what course is taken at trial? And Leatherman goes forward and then says to him about Mr. James, the expert who flew out and fought for Lotteria last week and came up with the opinion that the prosecution testimony on bloodstains and blood spray is correct. He's telling him, I have to take this position because of the evidence which I presented. But he's answering the judge's question and explaining why he would take that position. Well, Your Honor, I feel that he was giving a totally unanimous response to this. It's one thing to say the question is who ultimately is going to decide. I want it to be abstract. When the judge is asking what course will you take, and you want it to be abstract. Wait. Let's just back up a minute. What is the question that was before the trial court when this was going on? The question before the trial court was when Mr. Stenson said, my objective is to win the trial. And Mr. Leatherman said, the only objective of the lawyers is to win the trial. No, what was the issue? It was whether or not he should have substitute counsel? The issue was whether under those circumstances new counsel should be elected. Isn't the court supposed to inquire into the nature of the difference between the counsel and the client that would give rise to such a need? Your Honor, the court didn't believe that it needed to hear information like that. The court at the start of the proceeding tells Mr. Stenson in no uncertain terms, I do not want to hear anything that might be incriminating in any way. That's an ER-160. So it's clear that the court doesn't believe it. The court doesn't need to know why Mr. Leatherman thinks Mr. Stenson is guilty. I'm not really aware of any other cases where a lawyer just sets out to convince the judge that his client is guilty when the client is sitting there saying, but look, I didn't do it. That's not what Leatherman did. Leatherman said the defense that we had has just evaporated. That's why I have to go to the penalty phase rather than the guilt phase because what we had is gone. That isn't saying he's guilty. It's saying we don't have a defense. Therefore, we've got to go to penalty. I end up in the highest traditions of professional responsibility. Your Honor, I would say that, in fact, it was an abdication of his right to be an advocate for Mr. Stenson. He's supposed to advocate something that he knows is going to fail and is going to put the man in death penalty. Plead prejudice before the jury, that's the problem. There are two answers to that. First, under, for example, Harrison v. Cryer, there's a case where the Supreme Court said that a lawyer has the obligation to provide a defense even when no defense is available. The Supreme Court has never said that because you think that the evidence is bad against your client,  and there's nothing more clear in court law. Counsel, I was trying to think of what the lawyer would do in order to advance the theory that the dead man's wife did it. As I understand it, in Washington he couldn't do it because he didn't have enough of an evidentiary foundation to be allowed, even in cross, to ask questions that would impugn the wife's character by suggesting in innuendo that she shot the two of them. Do I understand Washington law correctly and the restrictions on what the lawyer would be able to ask correctly? Let's explain. Washington law is that it's a question that is, like most evidentiary rulings, it's an abusive discretion standard. The court has discretion to either allow the evidence or not allow the evidence. Second, in Washington, there's a line of cases that say, as in this case, when only circumstantial evidence is involved, the amount of evidence is somewhat lower. Mr. Lunderman knew, and this is right in his deposition, he knew that Denise Horner had made statements to at least two people indicating that the only way she could get her hands on the money of Mr. Horner due to a prenuptial agreement was if Mr. Horner was dead, and she made a statement basically that she wanted him dead. I don't know. That's a little different. A lot of wives have made statements, I ought to kill you or the only way I get this life insurance, and they're not serious. Well, maybe they're not serious, but in this case, of course, he had ended up dead shortly after these statements, so the statement may have taken a different significance. There was other evidence as well that he could have marshaled. There were these cartridges that is the same in nature used in the killings that were found in her driveway and in her car. She was one of the, and Mr. Lunderman says this in his deposition too, she's one of the very small pool of suspects that could have done the thing. But you're not arguing that anymore. You're not saying that the Washington Supreme Court, at the finding of ER 358, was incorrect in finding that Lunderman was not ineffective because the relatively weak evidence implicating Denise Horner would have been inadmissible. You're not saying the Supreme Court of Washington was wrong on that. Are you? What I'm saying is the Supreme Court never got the chance to decide that case in adversarial context because Mr. Lunderman, far from arguing that the evidence should have come in, argued that the evidence shouldn't come in, which was totally detrimental to Mr. Stenson's position. I mean, basically you've got, at this hearing, Mr. Lunderman over and over taking positions that... He didn't think he could get it in. He didn't, what he said was, I don't want this evidence coming in because if this evidence comes in, in my judgment, the jury will think that if I'm trying to blame it on somebody else, they'll dislike Mr. Stenson more. Right. Now, first, I think that there's an argument that is highly illogical when you consider that if there wasn't any other subject, it was just like the prosecution said in the closing argument. Well, if not Mr. Stenson, then who? And why a jury is going to look favorably on somebody who they think beyond a reasonable doubt has killed both his wife and his business partner. Was there a scintilla of evidence of Mrs. Horner was anywhere around the building? There was. Was Mr. Stenson ready to say, I saw her outside the building just before I went to the shed? Mr. Stenson never said that. His statements were consistent all along. He said he discovered the body. He didn't know. In the case of Mrs. Horner, did even Stenson implicate Mrs. Horner by physical presence at the scene of the crime? Yes or no? No. Mr. Stenson didn't know who did it. But the evidence was that Denise Horner lived five minutes away from where this was. She was the only person other than basically Mr. Stenson who knew that Mr. Horner was going to be there. And there was certainly evidence that Mr. Leatherman could have marshaled her. Okay. Could you just touch on what you think is the strongest argument you have with respect to the penalty case? Yes. I think there's two arguments, actually, Dovetailer. One, the best locket evidence was excluded. The evidence of the impact of Mr. Stenson's execution on his children and his family, which is locket evidence and mitigating evidence because it inferentially shows his character. What was the difference between that and the evidence that did come in about his strong family relationships and all that? The difference was that the evidence that came in was relatively innocuous, and the evidence that didn't come in would have been much more powerful. And, in fact, that's what the trial judge says when he's excluding it. He says probably, you know, this is at page, he says this is at 7292, 7293 of the record. The testimony that says bluntly, will you be devastated, will this person be devastated, that relationship is terminated by the death penalty, strikes me as too direct, too much appeal to, it says motion, but it obviously means emotion, and crossing that particular line. That's what the trial judge seemed to have been essentially concerned about, was that the evidence was going to be too emotional. But, of course, there's no reason for excluding it. All mitigation evidence is going to be emotional, but the evidence was powerful, and it should have come in. And what did the Washington Supreme Court say? The Washington Supreme Court said that the evidence wasn't really, didn't really bear on the character of Mr. Stenson or the circumstances of the crime, and, therefore, wasn't admissible. And they also said that you couldn't, they said in case of saying you can't have a person talking about what penalty he wants or not. But, in fact, the evidence did bear on Mr. Stenson's character, because it shows that, you know, even despite this crime, people would care enough about him to be devastated by his execution. Okay, that's fine. And if I could just add, the other point about the penalty phase is, this is in the context of Mr. Wetherman. Without Mr. Stenson's consent, the only thing that Mr. Stenson agrees that he's, that the defense agrees that and doesn't quarrel with the notion of the jury returning the guilty verdict, but also repeatedly denigrating Mr. Stenson, endorsing the state's theory of the case, a theory which we don't know from the jury verdict whether the jury had fought the arguments about whether, for example, Mr. Stenson was terribly greedy, and even going so far as to conduct a cross-examination, which even got that he, the lawyer, before trial, showed Mr. Stenson, the wife, the father of Mr. Stenson's wife, showed him a picture, and he was, he, Mr. Wetherman, Wetherman was the one who convinced the father that Mr. Stenson was guilty. And this was right after the defense had just, in closing argument, argued exactly the opposite. That was ineffective. And that, you can't, you can't just trash your own client without there being a reason for it. There wasn't any reason. Okay. Thank you. You've more than used your time. Thank you very much. We'll give you five minutes on rebuttal. May it please the Court. I'm John Sampson, Assistant Attorney General representing the Respondent. The district court in this case correctly denied the petition and denied relief because the state court adjudication of Mr. Stenson's claims was not contrary to Could you slow down just a little bit? I'm sorry, Your Honor. Was not contrary to or an unreasonable application of a Supreme Court precedent. The claims raised by Mr. Stenson essentially addressed three rights. The right to self-representation, the right to counsel, and the right to present mitigating evidence in the penalty phase. Counsel, I have a couple of questions. One, I don't know how pertinent it will turn out to be, but when I read this file, my reaction to it was, if I were defending this guy, there would be just one way to get him some mercy, maybe, and that is to show that it was a crime of passion rather than a crime of greed. It suggests that his partner and the partner's wife were having an affair, or I mean the partner and the defendant's wife were having an affair, so it's a crime of passion. No one pursued that, and apparently it's obvious to everybody why not, but it's not obvious to me yet. The obvious reason is there's no evidence to support that theory. Well, sure there's evidence. They knew each other. One's a man and one's a woman, and they're both dead, and the husband did it. The way Mr. Stenson committed the crime, he somewhat tried to rely on that fact. And the evidence doesn't need to be that they actually did have an affair, just that the defendant thought they were having an affair in order to try to get some mercy because it's a crime of passion. Well, not really that, Your Honor. What he did when he set up this murder was he tried to make it look like a murder-suicide, like Frank Horner was in love with Denise and he realized she didn't love him or they were breaking it off, and therefore he killed her and then killed himself. To then try to say, well, really I killed them in the heat of passion when he had made all these false statements to the police about it being a murder-suicide and false statements about how he came upon the body after it was already in the house, that would have conflicted with all the forensic evidence in the prior statements. There's just no evidence to support that type of a claim, so a defense counsel could... And there's been no... It would have been inconsistent with the other evidence that he has given, is that what you're saying? Yes, Your Honor, exactly. And there's been no allegation that the counsel should have pursued that type of a claim in the first place, so that's simply not a claim before the court. But there's no evidence to show that that theory could have succeeded in any form. Mr. Stinson, can I take you to another issue? Take a look at ER-591, which is the defendant's motion to continue trial, appoint him to counsel or, in the alternative, allow him to proceed pro se. There's no attorney line on that motion. That motion was made by Mr. Stinson while he is still represented by Leatherman and Luper. Your Honor, may I step back to the table and grab that? 591. 591. Why shouldn't we say that at this motion for appointment of new counsel or to proceed pro se, Leatherman effectively removed himself as counsel and that Mr. Stinson was unrepresented and, therefore, under the Sixth Amendment, did not have assistance of counsel at a critical stage in this proceed. Your Honor, I apologize. I cannot find excerpts of Record 591. Here, I'll give you mine. It's just a motion. It's the two-page motion. It was prepared by Mr. Leatherman. I know, but take a look at it. No attorney line, and it says he moves. Now, he can't move, we all know that, until he is in pro se. Once he has counsel, only counsel can address the court on his behalf. Leatherman and Luper are his attorneys. They step aside and let him file a motion. And the court probably should have said, I'm going to strike this pleading because it can't be presented by a representative party. And the motion to allow him to proceed pro se must be presented by his counsel. When I rule that he can proceed pro se, then I will discharge counsel. But until that time, you have an obligation to represent him. All that was not done, and I think was erroneously not done. Now, why didn't that result in Mr. Stinson not having representation at all at a critical stage in the proceeding, and therefore violating his right under Gideon v. Wainwright to have assistance of counsel at a critical stage in the proceeding? Because, Your Honor, there's no Supreme Court case, U.S. Supreme Court case, where the holding goes to that narrow of a requirement that counsel must sign every single pleading. And I think that looking at the record... No, no, no, not must sign every single pleading, but there is Gideon v. Wainwright holds that a defendant in a felony case has a right to counsel representation at every critical stage in the proceeding. Now, this is a critical stage in the proceeding. We can agree with that, right? Yes. Now, when counsel not only doesn't sign the pleading, but doesn't represent him on the hearing, and says, I disagree with him on this motion, and I will not argue for him on this motion. Well, Your Honor, I disagree. He doesn't have any representation on the motion. He's got the same as not having assistance of counsel. That's the ultimate question. Is the lack of representation at the motion the same automatically? It's a structural error. And I disagree, first of all, with the characterization of what actually occurred at that hearing, because there was quite a bit of discussion over whether Mr. Stinson could file a motion, how it should be filed. It was, in fact, prepared by counsel. Two counsel did, in fact, appear on his behalf and represent him. Even though they may not have signed the actual motion, they were representing him. So your position is that we should take a look at the actual transcript to determine whether Leatherman and Newkirk, even though they didn't sign the motion, and even though they said they didn't appear as representing him because he was making his own motion, were, in effect, giving the assistance of counsel which is required under the U.S. Supreme Court. Yes, the Supreme Court has, in subsequent cases, clarified that what the court is talking about is the complete denial of counsel. It's not that counsel, and there is no U.S. Supreme Court case that I'm aware of that held that counsel's failure to sign a motion results in the actual denial of counsel, which is a violation of Gideon. Two counsel appeared on behalf of Mr. Stinson, and while they did not blindly follow his wishes in this case, that is not a denial of counsel. What the Supreme Court looks at is did counsel appear, did they counsel him, did they give advocacy on behalf of Mr. Stinson? And they did. They cross-examined witnesses, 25 to 33 witnesses. No, but at the hearing that we're focused on, your position is that the Washington Supreme Court did not make an unreasonable finding of fact when it found that Stinson was represented at the hearing at which he made a motion to have new counsel or any alternative represent himself. That's your position. Yes, exactly. The state court decision on this was a reasonable determination of the facts and the application of the federal law. The U.S. Supreme Court has never put that much form over substance in saying that a failure to sign a motion wipes out a death case. They couldn't have signed it, I suppose, because their position was that he shouldn't have independent counsel. I mean, they shouldn't go pro se, that the trial should proceed on the strategy that they had chosen, I guess. Well, the position presented by Mr. Leatherman was that this is what the dispute is between Mr. Stinson and I. We are not giving up. We have no intention to quit. We will continue to represent Mr. Stinson. But we will put his position before you in this motion. Yes, and Mr. Stinson was allowed also to present his dispute with counsel. Mr. Stinson consented to the dispute being outlined during the in-camera hearing. He had the opportunity to make his case as to why there was an alleged conflict. He failed to demonstrate a sufficient conflict that required the substitution of counsel. Counsel, help me on something else. I was very interested in Justice Sanders' dissent in the Washington Supreme Court and the discussion of timing. This intrigued me. A trial does not start for purposes of the double jeopardy clause until the jury stands up, they raise their right hands, and they're sworn. That's when jeopardy attaches. It looks as though the majority in the Washington Supreme Court said the trial starts when the voir dire starts. I didn't study Ferretta perhaps closely enough to catch this. I didn't see where Ferretta really drew the distinction with any clarity. Does the trial start for Ferretta purposes when voir dire starts or when the jury is sworn? The Supreme Court has not ruled on that issue. They have not issued a holding on when the trial starts for purposes of a Ferretta claim. The Supreme Court in Ferretta merely said the request was made weeks before trial. Okay, that's what I understood, so I didn't miss anything. No, you're right. Now, tell me why for Ferretta purposes we should deem the trial to start when voir dire starts, even though for double jeopardy purposes we deem the trial to start when the jury is sworn. First of all, this Court in Marshall v. Taylor said that because the Supreme Court has not clarified what is timely for purposes of Ferretta and when a trial would start, that anything that the state court does that comports with the requirement that something weeks before trial is timely will be a reasonable application of Supreme Court precedent. Second, when you're talking about double jeopardy analysis versus the right to self-representation, those are two separate rights, and to say that the U.S. Supreme Court is holding or this Court is holding on when trial starts and when double jeopardy attaches necessarily applies to a Ferretta claim would be an improper extension of Supreme Court precedent. The Supreme Court has never extended that case law in this manner. Okay, aside from this, that the Supreme Court hasn't said, and if they haven't said, then under AEDPA we have to follow a reasonable interpretation by the state Supreme Court. Tell me a reason why a trial should be deemed to start when the voir dire starts. Because the issue is not on Ferretta, it's not when the trial starts, it's what is timely. And in the capital case, it contains an extensive jury selection process where you have to death qualify the jury. In this case, jury selection had been going on for three weeks before this issue was even raised. The other issue in determining timeliness is whether there would be a resulting delay. And if the motion had been granted in this case, there would be a delay, because they would have essentially to obstruct this jury and re-impanel a new one to reschedule 60 witnesses and to give probably at least a month's time. Why would he need to impanel a new jury? Because the counsel, if they had substituted counsel or if they let Mr. Stinson select his own counsel, they would have not been the ones who have chosen this jury. So what? So what? The trial judge's belief would be that they have to start afresh. Why would they have to start afresh? Why not take the jury, reschedule trial for three weeks down the road or four weeks down the road, and then call the jury back? We had an experiment in federal court a few years ago where one judge would pick all the juries for the month, at the beginning of the month, and then they'd be called back. The concern, especially in the small community of Kuala Lumpur County, would be publicity and the prejudicial effect it could have on the jury. If the jury is out of court for a month, they could potentially be subject to prejudicial ex parte contact in violation of the right to impartial jury. And for that reason, they would want to reselect a jury. Or at least they'd have to go through extensive colloquy with each jury to determine whether or not the jury was prejudiced by that publicity. But also, the mere delay itself, a month's delay, is reason alone to deny both a motion to select. Why? Why? Therefore, the state court decision cannot be contrary to or unreasonable application of that, and relief is barred. But even this court, in its holdings, has held that delay is a sufficient reason. Let me ask you something about the month, incidentally. My experience in practice was that as lawyers gain experience, they get more and more busy with more and more important cases in private practice. No one would be able to say, starting next month, I can give you three weeks or six weeks or eight weeks of my time, totally, unless they're a brand new lawyer. How do you get? Why did everybody assume they could start up again in a month if they got a new lawyer? Mr. Leatherman, when asked by the trial judge, said it would take, working on nothing but this case, it would take a lawyer 30 days to get ready. So that's where it came from. That's where it came from. I was thinking, I always was scheduled up about a year out. I thought everybody was in private practice. I think 30 days is the smallest amount of time it would take for a new lawyer. It's my understanding Mr. Stenson wanted David Marshall, who is a very experienced criminal defense attorney who focuses. Did he say Marshall was available a month out? Stenson represented that Marshall would be available in a week, and that's just not a reasonable determination in light of the facts of this case, in light of the record, in light of how long this case took. He had his own practice that he would have to take care of as well. There would likely be motions that Mr. Marshall would have wanted to bring that would further delay the case. The state court's decision that this was not timely was not contrary to and was not an unreasonable determination of either the facts or the federal law. Mr. Stenson argues that the trial court in this case just summarily denied his request to proceed pro se based on simply the written papers. I would submit that that's an inaccurate reading of what actually occurred, and I would point from excerpts of record 129 through 155 where there was discussions with Mr. Stenson and with Mr. Leatherman before the judge said, I find this motion to be both untimely and unequivocal. Or not, excuse me, not unequivocal. And that was in supplemental excerpts of record three to four. Then the judge said, and also excerpts of record 153 to 155, the judge, after making that statement, then said, these are my musings. You can have the opportunity tomorrow to further clarify on what I've said about this. And Mr. Stenson, and this is excerpts of record 154, said, I do agree and understand. It says what, but I think the word actually was that. I do agree and understand that the court is addressing the problem. When the court said, I find that what you really want is counsel, Mr. Stenson essentially said, that's correct. I agree that you're addressing the problem. The same way as- Pardon me, counsel, did Mr. Stenson, did the judge ever offer Mr. Stenson the option of proceeding pro se with Leatherman and Newport as what we call standby counsel? No, he did not, Your Honor. Mr. Stenson, during the subsequent hearing, made, and also I believe in a letter he wrote to the judge, and that's in the excerpts of record 12 through 20, did make a suggestion that they could put a new attorney to represent Stenson in the guilt phase, allow Mr. Newport to remain as co-counsel, and then bring Mr. Leatherman back in the penalty phase. And that suggests that what Mr. Stenson really wanted was counsel, not self-representation. And it also demonstrates that the conflict between Mr. Stenson and Mr. Leatherman was not so severe that it resulted in a total breakdown of communication. And when the judge denied after the in-camera hearing on the next, actually on the next day, on July 14th, and this is excerpts of record 205 to 206, which was cited just now by Petitioner's Counsel, the judge did say, again, that the, when Mr. Stenson said, I formally make a motion that I be able to allow to represent myself, the judge said, again, it was not timely, and I find, based on your indications, that you really want to proceed without, that you do not want to proceed without counsel. Mr. Stenson's immediate response was, likewise, I do not want to proceed with the counsel that I have. In other words, likewise, I, essentially, I am agreeing with your statement that I don't want self-representation. What I really want is new counsel. Now, the finding of whether a request is equivocal or not is a finding of fact. This Court has held, has stated so in the Kindenberg case, and the Eighth Circuit and Fourth Circuit have also expressly said this is a finding of fact. It's a finding of fact because you're trying to determine, based not only on what the defendant is saying, but the trial judge's observations of the defendant when he's saying it, similar to a defendant's statements during a plea colloquy. Those, those, Okay, I think that, so that brings in a different AEDPA standard for findings of fact, that there has to be no evidentiary support in the record or something like that? It is presumed correct unless rebutted by clear and convincing evidence. Under the prior version of the habeas statute, it had to be supported by the record. Now it's mandatory. It shall be presumed correct unless rebutted by clear and convincing evidence. Mr. Stinson, despite being offered the opportunity to further develop the record to try to rebut that, did not ask for an evidentiary hearing at federal court, has not presented any evidence to rebut that finding of fact. It's binding on both the state courts and the federal courts. In the light of that finding, the state court decision cannot be unreasonable. That would mean we have to accept that he did not make an unequivocal request for self-representation under AEDPA? Yes, Your Honor. And in light of that fact that he did not make an unequivocal request, he did not properly invoke the right to self-representation, and therefore he's not entitled to relief on that claim. Moving on to the issue regarding the other suspect evidence, and I think we briefly talked about that before, I would like to point out that Mr. Stinson continues to rely on evidence that was struck by the state court and that has not been properly presented in the federal court, the hearsay statements that one person allegedly overheard Denise Horner making comments about wanting to kill her husband. The state court specifically struck that as hearsay. It is hearsay. He tries to bring it in through counsel's deposition, but counsel's deposition is multiple hearsay because it's what counsel heard about what somebody else heard about what Ms. Horner said. It's not the type of evidence that would render this evidence, the other suspect evidence, admissible. And the state supreme court twice held, both on direct appeal and in the personal restraint petition, that this evidence was not admissible. The state court said even considering the struck evidence, the hearsay evidence, it's still not admissible evidence, so therefore there is no prejudice. And counsel's decision was reasonable. Mr. Leatherman said- Let me say that again. I missed something in that. Sure. Because the state court had ruled that this other suspect evidence is not admissible, that ruling is binding on the federal courts, and there can be no showing of prejudice because even if counsel had offered the other suspect evidence, it would not have come in. So therefore, it would not have affected the jury's verdict, and there's no reasonable probability that it would have affected the outcome of the trial. Therefore, his claim fails under Strickland. In addition, his claim fails under Strickland because counsel's decision was reasonable. Mr. Leatherman said, and these are his words, if we had done this, if we had attacked Denise Horner, quote, I'm convinced this jury will despise him and hate him and kill him, and that's at excerpt to record 175. That's a reasonable determination. Counsel had investigated the evidence, found there wasn't any evidence, found it was not admissible, and even if they presented it, it would have presented prejudice to the defense because it's a reasonably confident decision by a counsel. There is no denial of the right to counsel. The last issue that was argued, and if there are any other issues, I would be gladly willing to answer questions, but the last issue I will address that was argued by Petitioner is the exclusion of the execution impact evidence, and I would refer the court to the Fifth Circuit's opinion of Jackson v. Dreske, and I had submitted a supplemental citation of authority. The current site is now 450 Fed Third 614 out of the Fifth Circuit, and in that case, the Fifth Circuit denied a certificate of appealability on a very similar claim, that the exclusion of execution impact evidence violated the rights under Lockett and his project. The Supreme Court has said there are three categories of evidence the defendant must be allowed to present, the character of the defendant, the criminal record of the defendant, and the circumstances of the crime. The effect that an execution might have on somebody else does not fit within any of those three. The defendant was allowed to present extensive evidence and did present extensive evidence regarding his family, regarding his family's love for him, the fact that they would continue to visit with him, the relationship that they had with him both as a child and that they would continue to have with him in life in prison. They were allowed to argue inferentially that they would continue to have this relationship and that execution would hurt them in their ability to have this relationship. What they were not allowed to do was ask point-blank or answer point-blank two questions. What penalty should he receive? Should it be life or death? And how would this affect his family? Those were the only two questions they were not allowed to ask and were not allowed to answer. And the Supreme Court has not clearly established that that type of evidence must be admitted in the penalty phase. In addition, there's no showing, even if there was an error and even if the state court decision in this case was objectively unreasonable, there's no showing of factual prejudice under the harmless standard. The trial court excluded, in this case, victim impact testimony from Mr. Horner's family. The judge simply did not allow victim impact evidence and the judge indicated that it would open the door to such testimony if he allowed this type of evidence. And I'm trying to find the citation to that. And I apologize. I don't seem to have that written down on my notes, the actual page where the judge made that finding, but I believe it's also maybe referenced in the state court's opinion. But it's clear that even if they had admitted this evidence regarding the effect it would have on Mr. Stenson's children, the execution, the state could have then rebutted that and could have presented evidence to show the effect of this crime, the victim impact testimony. And in addition, what would the children have said, or really, what would Mr. Olbermann have said? Yes, the children would be left without any parents if he killed his father. Well, the jury already knew that. The jury already knew that if you sentenced Mr. Stenson to death, there are no biological parents remaining because the mother was killed by Mr. Stenson. There's no showing of actual prejudice because that evidence would not have really affected the jury's verdict in this case. Can I ask you a question with regard to the dissent in the Washington Supreme Court? And the question of whether the court should have permitted Lutherman to withdraw. The dissent says that the inquiry is not whether Lutherman did an adequate job presenting his case, but whether conflict existed between counsel and the defendant. The record demonstrates Lutherman never tried to present Stenson's theory of the case to the jury. That's true. Whether this theory was viable or not, it was up to Stenson to decide whether Lutherman should attempt to advance it. And it was up to the jury, not this court, to decide if the theory was believable. And so the trial court erred when it denied Lutherman's motion to withdraw. The sentence seems to be saying that this is what the defendant wants to argue, counsel has to argue for, and the defendant is the ultimate decider of that. What is wrong with that? The problem is it's not the standard established by the United States Supreme Court. In Mickens v. Taylor, the Supreme Court clearly said that a Sixth Amendment conflict of interest is limited to multiple representations of defendants during the same trial. The court said that lower courts had, in the past, extended that rule unblinkingly to all types of ethical conflicts between counsel and the defendant. And the court said, this is at 122 Supreme Court at 1245, quote, the language of Sullivan itself does not clearly establish or indeed even support such an expansive application. Counsel, Sullivan is about conflict of interest. This was not conflict of interest. This is a conflict about strategy. We sometimes say conflict for short, and we mean conflict of interest, so we mix them up. Here, the lawyer has no interest other than Stenson's, but they disagree on what to do in order to benefit Stenson. And I agree it's not a conflict of interest. It doesn't rise to the level. It's not a matter of not rising to the level. It has nothing to do with conflict of interest. There's disagreement about strategy, and I wonder what the law is on that. There is no Supreme Court holding on that issue. What the Supreme Court has held is that, well, I guess there's no holding by the Supreme Court that says the defendant is entitled to new counsel and is entitled to relief when counsel is not substituted. What the Supreme Court has said in Florida v. Nixon is that decisions regarding strategy, and I know Petitioner argues it's not strategy, it's trial objectives winning the case. Those decisions rest in the attorney, and the attorney need not obtain the express consent of the defendant before pursuing that strategy. Petitioner asks his court to extend Nixon to a case where the defendant expressly objects, but there's no U.S. Supreme Court case dealing with that, and there's certainly no U.S. Supreme Court case saying that's constitutional error, and for that reason he's not entitled to relief. The Supreme Court may someday reach that issue, but at this time relief is not available. And finally, Your Honors, on that point, even under this circuit's case law, relief is not available because it did not result in a total breakdown of communications, and counsel did not totally give up on this case. Counsel did aggressively try to save Mr. Stinson's life and did aggressively challenge the state's evidence. What he did not do was make a decision that he felt was improper and would prejudice the defense. We would ask the Supreme Court to pardon me. Thank you. Are there any further questions? All right. Thank you. Thank you. I know we've been up here for a long time, so I'll try to be very brief. The first, Judge Kleinfeld, the footnotes you were inquiring about in Fred, it's not six, it's note five, and it reads, Fred also urged about success that he would tell the counsel of his choice and three-time move for the appointment of a lawyer other than the public defender. These motions, too, were denied. If I might clarify some of your questions about whether Mr. Stinson was represented at the hearings on his request for new counsel. What the Washington Supreme Court ruled was that they didn't disagree it was a critical stage of the proceedings and they really didn't disagree that Mr. Leatherman had adopted an adversarial position. Instead, on page 739, what they say is, Petitioner was continuously represented by one co-counsel not in an adversarial position to him. And that is simply an unreasonable determination of the facts because the facts demonstrate that Mr. Newport, at the hearings, did nothing whatsoever to represent Mr. Stinson. And, in fact, Mr. Leatherman specifically said that Mr. Newport agreed with everything that he, Mr. Leatherman, was saying. For example, this is on the excerpt of record, page 175. Mr. Leatherman says, I'm not alone in this opinion. I want to drag Mr. Newport in here, too, and say that he shares it. And on page 161, Mr. Leatherman says, It's my, well, I won't just say my, it is Mr. Newport's, in my opinion, that the guilt stage is not winnable. Mr. Newport does not act in any respect as Mr. Stinson's lawyer at the hearing. His remarks are confined entirely to a neutral recitation of how it was that Mr. Leatherman got appointed. But on the issues that mattered, Mr. Leatherman- Who was he? Who wasn't he? I'm sorry? Who was Newport, then? Mr. Newport was the second chair of the hearing. Yes. And that's the person that the Washington Supreme Court said is representing Mr. Stinson at these hearings, when, in fact, Mr. Newport didn't do anything at the hearings. I mean, he basically don't know he's there until the very end. Was that the only basis upon which they made the finding that he was reasonably represented? Or did they make- There is no other basis for reasonably- Did the Washington Supreme Court say, this is the only basis upon which we find that he was reasonably represented or he was represented? Or did they make an overall finding that he was adequately represented by Leatherman? Well, they made findings in other stages of the procedure. I'm talking about the issue of what he represented at the hearings and the motion for Newport- I don't understand how not talking has anything to do with not being represented. Very frequently, a lawyer determines that the best strategy is to say, no cross, no questions, no further argument. Silence is often the best choice. We've got a hearing going on. There's two lawyers. Let's say Ms. McClellan and I are representing- She hasn't said a word, but I'm sure she's representing your client by doing a great deal of work. But you wouldn't say she's representing Mr. Stinson, because she hasn't said anything to disagree with what Mr. Stinson is saying. Mr. Leatherman is arguing against Mr. Stinson. Mr. Newport is sitting there. He is aligned entirely with Mr. Leatherman. So if Mr. Leatherman is adopting an adversarial position, so is Mr. Newport. The fact that he's not saying anything doesn't transform him into an advocate for Mr. Stinson. Counsel, let me ask you this. You're an experienced public defender, and I am troubled by how we write an opinion. It says that where defense counsel takes a view of the strategy at the trial of what is in the best interest of the client, and the client takes a position that would like a contrary position asserted that is going to be in the judgment of the lawyers, and the judgment of the trial judge who is familiar with both the lawyers and who had the case, who lived with it, is not a good strategy. It's silly that we somehow have to-how do you write the opinion? At that point, the judge is to do what? Stop everything and appoint another counsel to represent the defendant, to understand all of the evidence, and to try to figure out whether this is a sensible position or not? What is to happen? Well, under Wadsworth, which is a case that is based on clearly established Supreme Court law, and which this court can therefore look for, the judge should appoint another lawyer once the attorney turns into an adverse witness and an antagonist. Well, that's what I-we don't have that situation here, I don't think. Well, I- In Wadsworth, the counsel, as I understand it, wasn't doing anything. The judgment here is that this counsel was representing the defendant. Well, the Wadsworth court doesn't-in fact, I can read to the court in Wadsworth. What the Wadsworth court says is once the attorney-this is paraphrasing, of course-but once the attorney adopted an antagonistic position, they say that the court should have appointed new counsel because critical rights were at stake and Mr. Wadsworth was effectively unrepresented at that hearing. That's the ruling in Wadsworth. Now, in respect to the court's second question, I don't think it's actually that difficult of an opinion to write because I think what one can say is that no disquestion about it. The attorney controls the strategy in the case. It's up to the attorney to use all his skills and expertise to-and make strategic decisions. That's not what we've got here. What we've got here is an attorney who's saying, I don't care that my client says he's not guilty. I think he's guilty and, therefore, I am going to make the only issue what the penalty is, which is a totally different question from what- Not a judgment about what is going to happen as a result of the trial and the strength of the evidence of what the jury might do. That's-I understand. Counsel, this comes up all the time before trial. Very commonly, the client comes into your office and says, I didn't do it. I wasn't even there. And then you have them come back into your office and tell them, well, the police report says this and this witness says this, this witness says this. It really doesn't look viable. And the DA has told me that he'll make a deal for this if you plead and you're looking at this if you don't. And the client always goes and tells friends, you're in cahoots with the DA, at least in a small town like mine. The lawyer says, you ought to take the deal. You're going to get hammered if you don't. At that point, their positions are antagonistic about the objective of the defense. If I understand your argument right, since it would be perfectly timely at that point, every defendant in that situation who thinks his lawyer is in cahoots and doesn't agree with his strategy, every defendant is entitled to a new lawyer. No, that's not my position. Why wouldn't it follow?  Why wouldn't it follow? I know you've been there. Every defense lawyer has. And, you know, I'm not constantly running into court and saying, we need a new lawyer. Why wouldn't your clients be entitled to get rid of the public defender's office and get somebody else appointed every time? They're not entitled. No one is claiming that Mr. Stenson is entitled to a lawyer who tells him what he wants to hear, and no one is claiming that the lawyer doesn't get to control the strategy. This is a different situation altogether. The situation here is that Mr. Stenson says, I'm innocent. I want to get acquitted. Mr. Leatherman says, you're guilty, and I'm not going to make that my goal. We have a different goal. But you're misquoting Mr. Leatherman at page 4779 when discussing his expert testimony. And that evidence is not necessarily, doesn't prove that Mr. Stenson killed Mr. Horner and his wife, but it does directly contradict the statement, various statements that he gave to the police. He's not saying, I'm saying Stenson did it. He's saying this evidence, which I had relied upon to help prove that he was, or at least create a reasonable doubt, isn't there. I can't use it. Your Honor, if I may quote Mr. Leatherman, this was in response, which has a specific, where Mr. Leatherman is specifically telling him, says, what's the nature of the controversy? This is what he says at page 160, ER 161. Put another way, from the perspectives of the lawyers, the only issue in this case is whether Mr. Stenson lives or dies. From Mr. Stenson's perspective, the only issue that is important to him is whether he has acquitted or not. Because we disagree over that fundamental decision, we have differing ideas about how we should proceed tactically in the guilt phase. And that is, in summary, the nature of the conflict. You've got the lawyer saying, I don't. But he didn't get up in the guilt phase and just say, ladies and gentlemen of the jury, I'm just going to let this proceed and you'll hear from me on the penalty phase if we reach that. He vigorously defended throughout the guilt phase. He cross-examined skillfully, and even though he thought there was no chance, he fought it. Well, there are two responses to that. First, once Mr. Leatherman said that I do not have as my goal winning the trial, that should have been the injunctive point. I think we understand your position. We're way over. I know, Your Honor. I'm not trying to try the patience of the court, but I wouldn't be happy to answer any other questions if the court has any. Is there any further questions? The court is adjourned. Thank you very much, Your Honor. I want to compliment counsel on a very well-argued matter. Thank you. Both sides. Both sides. Thank you, counsel. And that concludes the court's calendar for this morning. The court stands adjourned.
judges: Schroeder, Kleinfeld, Bea